**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

───────────────────────────────

VERONICA KRONSTEIN,

                    Plaintiff,

        v.                                          1:21-cv-00543 (AMN/ML)

ALBANY COUNTY, ALBANY COUNTY
SHERIFF'S DEPARTMENT,

                    Defendants.

───────────────────────────────

**APPEARANCES:**                                **OF COUNSEL:**

**SUSSMAN & GOLDMAN**                           **MICHAEL H. SUSSMAN, ESQ.**
1 Railroad Avenue, P.O. Box 1005
Goshen, New York 10924
*Attorneys for Plaintiff*

**ALBANY COUNTY ATTORNEY'S OFFICE**             **SIA Z. GOOGAS, ESQ.**
112 State Street
Albany, NY 12207
*Attorneys for Defendants*

**LIGUORI & HOUSTON, PLLC**                     **JOHN W. LIGUORI, ESQ.**
69 State Street, Suite 1200
Albany, NY 12207
*Attorneys for Defendants*

**Hon. Anne M. Nardacci, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I.      INTRODUCTION**

On May 7, 2021, Veronica Kronstein ("Plaintiff") commenced this action pursuant to the

Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12101 *et seq.*, against the County of

Albany and the Albany County Sheriff's Department (collectively "Defendants"), alleging that

Defendants denied her a reasonable accommodation for her disability. *See generally* Dkt. No. 1

(the "Complaint").[1]  On June 7, 2021, Defendants filed an Answer to the Complaint.  *See* Dkt. No.

7.  Presently before the Court is Defendants' motion for summary judgment pursuant to Rule 56

of the Federal Rules of Civil Procedure.  Dkt. No. 36 (the "Motion").  Plaintiff filed an Opposition,

Dkt. Nos. 38-39,[2]  and Defendants filed a Reply, Dkt. No. 41.

For the reasons set forth herein, Defendants' Motion is denied.

## II.    BACKGROUND [3]

Plaintiff has been employed as a Correction Officer at the Albany County Corrections and

Rehabilitative Services Center (the "Correctional Facility") for approximately ten years.  Dkt. No.

36-1 at ¶ 1.[4]  Plaintiff alleges that Defendants violated the ADA by denying her a reasonable

accommodation between October 2020 and October 2021, after she suffered a knee injury but

before she had surgery, and between January 2022 and November 2022, after she had recovered

---

[1] On March 16, 2021, Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC").  *See* Dkt. No. 1 at 12-20.  On April 1, 2021, the EEOC sent Plaintiff a right to sue letter.  *Id.* at 22-23.

[2] On February 9, 2023, Plaintiff filed a Letter Request seeking leave to file a corrected version of the response to Defendants' Statement of Material Facts, Dkt. No. 39, which was granted, Dkt. No. 40.

[3] Unless otherwise indicated, the following facts have been asserted by the parties in their Statements of Material Facts with accurate record citations, and expressly admitted or not denied with a supporting record citation in response.  *Compare* Dkt. No. 36-1 (Defendants' Rule 56.1 Statement of Material Facts), *with* Dkt. No. 39-1 (Plaintiff's Response).  The Court has also considered the Complaint and exhibits submitted by the parties, Dkt. Nos. 1, 36, 38.

[4] At all relevant times, Michael Lyons served as Superintendent of the Correctional Facility ("Superintendent Lyons") overseeing policy and procedure, and Anthony D'Angelico served as a Major ("Major D'Angelico"), overseeing day-to-day operations, union work, contract negotiations, and the maintenance department.  Dkt. No. 36-1 at ¶¶ 6-7.  Michael Monteleone is currently the Undersheriff in the Albany County Sheriff's Department ("Undersheriff Monteleone") and is Superintendent Lyons's superior and does not oversee the day-to-day operations of the Correctional Facility.  Dkt. No. 36-1 at ¶¶ 8-9.

from surgery and could return to work.  *See generally* Dkt. No. 1; Dkt. No. 38 at 1-3.[5]  Plaintiff

alleges that as a result of Defendants' actions, she has exhausted her sick leave, limited her vacation

days, and suffered "emotional distress, physical pain, and discomfort."  Dkt. No. 1 at ¶¶ 52-53.

### A.    Plaintiff's July 31, 2019 Incident

On July 31, 2019, Plaintiff was involved in the transport of a pregnant inmate to another

wing of the Correctional Facility and alleges that during this transport she sustained a work-related

knee injury.  Dkt No. 36-1 at ¶¶ 12-13.  Plaintiff reported her injury on August 12, 2019, twelve

days after the incident, after experiencing increasing pain while walking on stairs and level

surfaces, pain while running, swelling in both knees, and the loss of her ability to climb stairs, sit

down in a low chair, and get up from a low chair.  *See* Dkt. No. 36-1 at ¶¶ 15-19.[6]  Plaintiff

understood that her injury impaired her ability to control inmates.  *Id.* at ¶ 20.

On August 13, 2019, Plaintiff saw Dr. Jeffrey Lozman, an orthopedic surgeon.  *Id.* at ¶ 53.

At that time, Dr. Lozman determined that Plaintiff was "100 percent" temporarily impaired, and

Plaintiff would be able to return to work after a short period of rest.  *Id.* at ¶¶ 55-56.  On September

11, 2019, Dr. Lozman diagnosed Plaintiff with "bilateral knee chondromalacia," an arthritic knee

condition, and confirmed that Plaintiff's knees "were causing her substantial pain and impairing

her ability to return to work."  *Id.* at ¶ 21; Dkt. No. 36-24 at 4.

### B.    Plaintiff's Applications for Section 207-c and Workers' Compensation Benefits

Plaintiff took medical leave under the Family Medical Leave Act ("FMLA") from August

---

[5] Citations to court documents, including deposition transcripts, utilize the pagination generated by CM/ECF, the Court's electronic filing system.

[6] Defendants assert that Plaintiff "did not tell anyone of her injury or report her injury to the Correctional Facility" on July 31, 2019.  Dkt. No. 36-1 at ¶ 14.  Plaintiff responds that Major D'Angelico "recalled the Tour Commander telling him about the injury right around the day it happened."  Dkt. No. 39-1 at ¶ 14.

13, 2019, the date she first saw Dr. Lozman, until October 17, 2019.  Dkt. No. 36-1 at ¶¶53-54.

On August 14, 2019, Plaintiff applied for both benefits under New York General Municipal Law

§ 207-c ("Section 207-c")[7] and Workers' Compensation.  *Id.* at ¶ 45.[8]

Dr. Martin Gingras, an independent medical examination ("IME") doctor, examined

Plaintiff during the pendency of her Workers' Compensation application.  Dkt. No. 36-1 at ¶ 23;

*see generally* Dkt. No. 36-25.  Dr. Gingras first evaluated Plaintiff on October 4, 2019 (the

"October 4 IME Report") and diagnosed Plaintiff with moderate bilateral chondromalacia patella

"from the work-related injury that occurred on" July 31, 2019.  Dkt. No. 36-25 at 5, 12-13.  Dr.

Gingras found that Plaintiff's disability was "moderate," and that she "may not be able to resume

full activities as a [Correction Officer]" but that she "could be working with limitations of no lifting

of more than [fifteen] pounds [and she] should also refrain from squatting, kneeling, and stairs as

much as possible."  *Id.* at 13.  Subsequently, Dr. Gingras watched the video of the July 31, 2019

incident and "commented that the video did not change [his] opinion."  *Id.* at 5.  Dr. Gringas then

reviewed the video a second time, and issued an Addendum to the October 4 IME Report that

Plaintiff's injury was *not* work-related but was instead likely "age related."  *Id.*[9]

---

[7] New York General Municipal Law § 207-c provides, in relevant part: "Any . . . [Correction Officer] of the sheriff's department of any county . . . who is injured in the performance of [her] duties . . . so as to necessitate medical or other lawful remedial treatment shall be paid by the municipality by which [she] is employed the full amount of [her] regular salary or wages until [her] disability arising therefrom has ceased, and, in addition such municipality shall be liable for all medical treatment and hospital care necessitated by reason of such injury."

[8] On August 29, 2019, Defendants denied Plaintiff's application for Section 207-c benefits because it was untimely filed.  Dkt. No. 36-1 at ¶ 47; Dkt. No. 36-11 at 20.  The denial was upheld on appeal.  Dkt. No. 36-1 at ¶ 48.  Additionally, on January 14, 2020, the Workers' Compensation Board denied Plaintiff's claim for benefits on the grounds that it did not find her version of events credible and that Dr. Lozman relied exclusively on Plaintiff's version of events in rendering his medical determination.  *See* Dkt. No. 36-10 at 10-11.  The decision was upheld on administrative review.  *Id.* at 12-15.

[9] Defendants characterize Dr. Gingras's opinions as determining that Plaintiff "suffered from bilateral chondromalacia patella and the injury was moderate, most likely age related and that she

### C.   Correction Officer Job Duties

The duties of a Correction Officer are defined by the Collective Bargaining Agreement, the post orders of the Correctional Facility, and the civil service job description of a Correction Officer.  Dkt. No. 36-1 at ¶¶ 81-82.[10]  A Correction Officer is generally "responsible for custody, care and control of the inmate population" and required to be "in a physical condition commensurate with the demands of the position."  Dkt. No. 36-1 at ¶ 82.  A Correction Officer's duties also include responding to emergencies and "situations or behavior . . . between inmates or between an inmate and a fellow [C]orrection [O]fficer," handling "the transport of an uncooperative inmate," and "making supervisory rounds every half hour where they walk the entire tier and observe the inmates."  *Id.* at ¶¶ 84-87.[11]

### D.   Correctional Facility Light Duty Assignments

Correction Officers are assigned to positions at the Correctional Facility through a bidding system dictated by the CBA.  Dkt. No. 36-1 at ¶ 74.  There are job assignments for different styles of inmate housing, some of which have stairs and some of which are linear tiers.  *Id.* at ¶ 89.  The CBA has a "seniority clause" where Correction Officers are able to bid into certain positions based

---

may never be able to return as a full duty [Correction Officer]."  Dkt. No. 36-1 at ¶ 23.  Plaintiff disputes this characterization, noting that Dr. Gingras issued three separate opinions, two of which were consistent with Plaintiff's version of the July 31, 2019 accident, and that Dr. Gingras never opined with "certainty" that her injury was "age-related" or whether she could return to work as a full duty Correction Officer.  Dkt. No. 39-1 at ¶ 23.

[10] Defendants submitted as exhibits the agreement between the County of Albany and the Albany County Sheriff's Local 775 of Security and Law Enforcement Employees Council 82, AFSCME, AFL-CIO, in effect from January 1, 2017 to December 31, 2021, Dkt. No. 36-9 (the "CBA"), the General Housing Units Post Order, issued by Superintendent Lyons, dated August 31, 2008, Dkt. No. 36-16, and the civil service job description of a Correction Officer, Dkt. No. 36-6.

[11] Additionally, the civil service job description of a Correction Officer states that "typical work activities" include among others, supervising inmates and also requires that a Correction Officer be in "physical condition commensurate with the demands of the position."  Dkt. No. 36-6 at 2.

on seniority; however, the Correctional Facility may shift job assignments when necessary to maintain services.  *Id.* at ¶ 75.[12]

While a Correction Officer is typically assigned to their "bid position," the CBA requires that a Correction Officer be able to work in all areas of the Correctional Facility.  *Id.* at ¶ 88. Therefore, due to operational needs, supervisory staff can place Correction Officers in a position other than their bid position.  *Id.* at ¶ 90.  Additionally, a Correction Officer must be able to work mandatory overtime if the Correctional Facility operations require it.  *Id.* at ¶ 91.

Light duty jobs are assignments where the Correction Officer does not have contact with inmates.  *Id.* at ¶ 100.[13]  All light duty positions are bid positions, and the more senior a Correction Officer, the more likely he or she is to have a bid position that requires less inmate contact.  *Id.* at ¶ 77.  There are two shifts for light duty positions: 7 am to 3 pm and 3 pm to 11 pm.  *Id.* at ¶ 105.

Defendants' practice is to provide a light duty assignment to Correction Officers who are found eligible to receive Section 207-c and/or Workers' Compensation benefits.  *Id.* at ¶ 92.  If a Correction Officer has applied for Section 207-c and/or Workers' Compensation benefits, Defendants generally give the officer a light duty assignment pending the outcome.  *Id.* at ¶ 93.

The Correctional Facility does not have a "specific written policy for light duty for non-work-related injuries."  *Id.* at ¶ 95.[14]  It considers the recommendations of the doctor in determining

---

[12] The CBA defines "seniority" as "the length of an employee's uninterrupted service, within the bargaining unit, in the Sheriff's Department, including sick leave, military leave not to exceed four (4) years, reinstatement within one (1) year of resignation, other approved leaves of absence which do not exceed one (1) year and Workers' Compensation leave."  Dkt. No. 36-9 at 14.

[13] Major D'Angelico testified that a light duty position includes the Building A control area, the Building B control area, lobby controls, main controls, the medical control area, three positions in booking (property officer, control, and control assistant), and "Six West" control area.  Dkt. No. 36-1 at ¶ 102; Dkt. No. 36-7 at 19:16-20:14.

[14] Major D'Angelico testified that he was unaware of "any reference to light duty in any policy statement" other than relating to providing light duty assignments to claimants receiving Section 207-c or Workers' Compensation benefits, Dkt. No. 36-7 at 79:11-80-81:6, and that it was

whether an employee can work a light duty position.  *Id.*[15]  In determining whether a Correction Officer with an injury should be placed in a light duty post, Major D'Angelico consults with the Sheriff or with Undersheriff Monteleone.  *Id.* at ¶ 97.  The supervisor handles scheduling and will choose the specific position to which a person on light duty is assigned.  *Id.* at ¶ 99.  Superintendent Lyons testified that as a matter of practice for at least the past ten years, the Correctional Facility has "allowed people who had non-work-related injuries to come back to work light duty."  Dkt. No. 36-8 at 27:6-28:15.

Because light duty posts are bid positions, they are not occupied only by Correction Officers who are designated to work light duty based on an injury.  Dkt. No. 36-1 at ¶ 103.  Plaintiff testified that during the time she was working light duty, many other Correction Officers were also assigned to light duty in approximately ten jobs with no inmate contact.  Dkt. No. 36-21 at 43:1-25.[16]

### E.    Plaintiff's Light Duty Accommodation and Subsequent Removal from Light Duty

Plaintiff returned to work on October 18, 2019, and was placed on light duty assignment until October 1, 2020.  Dkt. No. 36-1 at ¶¶ 60, 109.  In 2020, during this light duty assignment, Plaintiff did not take any FMLA leave, unpaid medical leave, or sick leave at half pay.  Dkt. No.

---

"common practice" to provide light duty work to Correction Officers with pending Section 207-c and/or Workers' Compensation matters.  *Id.* at 81:10-82:17.

[15] The CBA provides that a Correction Officer "who has been continuously absent from and unable to perform the duties of their position for a year or more due to a non-occupational injury has up to a year to retain their position or they may be terminated," and that "an employee generally has up to a year to resolve any non-job related illness or injury, which renders the employee unable to perform the duties of their employment."  Dkt. No. 36-1 at ¶¶ 106-07.

[16] Plaintiff produced as an exhibit a list of fifteen Correction Officers with both work-related and non-work-related injuries who were provided with light duty.  Dkt No. 38 at 11; Dkt. No. 38-7 at 3-4.  Plaintiff also testified that a Correction Officer who had a "lighter" injury was permitted to work in a light duty post for four years and was still working in a light duty post at the time of her deposition.  Dkt. No. 36-21 at 57:18-58:12.

36-1 at ¶ 58.[17]   Major D'Angelico also testified that while Plaintiff worked in light duty assignments, he did not remember receiving any complaints from Plaintiff or other officers about those assignments.  Dkt. No. 36-7 at 71:9-72:8.

In October 2020, when Plaintiff had worked in light duty posts for approximately a year, the Correctional Facility determined that Plaintiff could no longer receive a light duty assignment. Dkt. No. 36-1 at ¶¶ 25, 112-13.  Major D'Angelico informed Plaintiff that she could only continue to work when she is medically cleared to work in a full duty position without restrictions ("full duty").  *Id.* at ¶¶ 120-21.[18] Defendants assert that Plaintiff was removed from light duty assignment because her injury was determined to be non-work-related, and she was not making progress towards returning to full duty.  *Id.* at ¶ 25.[19]   Major D'Angelico testified that before removing

---

[17] Plaintiff took FMLA leave from December 6 through December 14, 2019 to recover from pneumonia, and returned to work where she was returned to light duty until October 2020.  *See* Dkt. No. 36-1 at ¶¶ 24, 60; Dkt. No. 39-1 at ¶ 57.  From October 18, 2019 to October 1, 2020, while in a light duty position, Plaintiff used 60.5 hours of compensation time; 76 hours of vacation time; and 40 hours of personal time; and was docked 25.25 hours for either taking off unapproved time or not having sufficient accruals to cover her time off.  Dkt. No. 36-1 at ¶ 60.

[18]  Plaintiff alleges that she explained she continued to need a reasonable accommodation because eight to sixteen hour shifts in North and West wing posts in Buildings A and B ("Building A" and "Building B") required her to climb at least 17 flights of stairs during each shift, and her doctor explained "she needed this accommodation because, without it, her knees became very swollen and painful, and she could often not continue to work."  Dkt. No. 1 at ¶¶ 28-29.  Plaintiff testified that Major D'Angelico told her "he was nice enough to give [her] one year light duty, and his patience ran out, and, basically, suck it up," Dkt. No. 36-21 at 44:17-19, and alleged that Superintendent Lyons told her "that if she did not adhere to" the order to work full duty, "she could be terminated."  Dkt. No. 1 at ¶¶ 26-27.  Plaintiff also alleges that from "the fall 2020 forward, [Major] D'Angelico continued to insist that [she] have surgery or risk being terminated."  Dkt. No. 38-1 at ¶ 7.

[19] Plaintiff disputes this reasoning, stating that the Sheriff's Department had no policy to limit light duty assignment to one year.  Dkt. No. 39-1 at ¶ 25.  Plaintiff further asserts that her "condition was improving" and she was "engaged in physical therapy and going to the doctors" for her knee, and was "desisting from other activities to give" her knee "as much time off as possible."  Dkt. No. 38-1 at ¶ 12.  Superintendent Lyons testified that he could not describe what Plaintiff "needed to do" to show she was making progress.  Dkt. No. 36-8 at 18:14-19:3.

Plaintiff from light duty assignment he did not recall receiving any note from a physician saying that Plaintiff could work full duty.  Dkt. No. 36-7 at 88:10-89:5.[20]

**F.   Plaintiff's Return to Full Duty Work**

In October 2020, Plaintiff returned to working full duty and was placed in open bid positions or in "various positions within the Correctional Facility if her bid positions weren't being used."  Dkt. No. 36-2 at ¶ 12.[21]  After Plaintiff returned to working full duty, her knees would become swollen and painful at work.  Dkt. No. 36-1 at ¶ 26.[22]

Plaintiff alleges that on October 25, 2020, she re-injured herself while climbing stairs at B Building, experienced sharp pain and immobilizing stiffness in her left knee, and "promptly reported . . . that she could not climb stairs repetitively as required by posts" in Buildings A and B and could not return to work for five days.  Dkt. No. 1 at ¶¶ 36-37; Dkt. No. 36-1 at ¶ 28.  Plaintiff filed a Workers' Compensation claim related to the October 25, 2020 injury, alleging that she was injured while climbing stairs.  *See generally* Dkt. No. 36-20.[23]  She requested six weeks of light duty, which Defendants rejected.  Dkt. No. 38-1 at ¶ 5.

On November 3, 2020, Dr. Lozman wrote a note stating that Plaintiff required restrictions and could only return to work with modified duties that did not involve climbing stairs or squatting,

---

[20] Major D'Angelico also testified that he did not have training on the ADA, *see* Dkt. No. 36-7 at 23:12-25, and Superintendent Lyons testified that he was never told that the ADA only applied to work-related injuries, *see* Dkt. No. 36-8 at 17:12-15.

[21] Plaintiff alleges that when she was assigned to full duty in October 2020, there was not a "'waiting line' of disabled officers" for light duty assignments.  Dkt. No. 38-1 at ¶ 22.

[22] Defendants assert that during this time, Plaintiff "would often" leave shifts early claiming she was suffering from knee pain.  Dkt. No. 36-1 at ¶ 27.  Plaintiff asserts that she left work early "on occasion . . . due to excruciating pain."  Dkt. No. 39-1 at ¶ 27.

[23] On March 15, 2021, Plaintiff's second Workers' Compensation claim was disallowed as non-work-related.  Dkt. No. 36-1 at ¶ 51.  Plaintiff maintains that her July 2019 and October 2020 knee injuries were work-related.  *Id.* at ¶ 52.

and these restrictions were "permanent."[24]   Dkt. No. 36-1 at ¶ 29; Dkt. No. 36-24 at 8-9.   That

same day, Dr. Lozman issued another note that allowed Plaintiff to return to work with no

restrictions.   Dkt. No. 36-1 at ¶ 30; Dkt. No. 36-24 at 10.[25]

   Plaintiff's full duty work included working "double"—or sixteen-hour—shifts.   Dkt. No.

36-1 at ¶ 70.[26]   Plaintiff continued to work in Buildings A and B between November 2020 and

April 2021, except for a period of six weeks beginning in December 2020 when Defendants

allowed Plaintiff to temporarily work in a light duty position so that she could get cortisone shots

in her knee.   Dkt. No. 36-1 at ¶¶ 31, 96; Dkt. No. 38-1 at ¶ 6.

   During this period, Plaintiff states that she "repeatedly asked for an assignment to one of

nearly [forty] posts[27] which could" provide her with a reasonable accommodation.   Dkt. No. 38-1

at ¶ 6; Dkt. No. 39-1 at ¶ 32.[28]   Plaintiff testified that the reasonable accommodation she was

---

[24] Plaintiff disputes that Dr. Lozman characterized her restrictions as "permanent."   Dkt. No. 39-1 at ¶ 29.

[25] Plaintiff alleges that Dr. Lozman only issued the second note because Major D'Angelico told her that if she did not provide a full duty note, she would be barred from work without pay and terminated.   Dkt. No. 39-1 at ¶ 30.   Plaintiff admitted that there were other occasions when she would provide inconsistent notes as to whether she needed to work light duty or could work full duty, but that she did this because upon being denied a reasonable accommodation, she needed to work and working full duty exacerbated her injury causing her to again seek a reasonable accommodation.   *Compare* Dkt. No. 36-1 at ¶ 125, *with* Dkt. No. 39-1 at ¶ 125.

[26] Plaintiff alleges that she was ordered to work these shifts during the pandemic when the facility was short-staffed.   Dkt. No. 38-1 at ¶ 14; Dkt. No. 39-1 at ¶ 70.

[27] Defendants assert that Plaintiff's statement of "forty posts" is misleading and there were only six to ten light duty posts.   *See supra* n.13; Dkt. No. 36-1 at ¶ 102; Dkt. No. 41 at 8.   Plaintiff alleges that the "posts used for light duty are more expansive" than the posts Defendants identified, Dkt. No. 36-1 at ¶ 102, and that there were nearly forty posts within the Correctional Facility which "did not require the constant stair climbing like the ones to which she was assigned."   Dkt. No. 38-1 at ¶ 6; Dkt. No. 39-1 at ¶ 32.

[28] Plaintiff further asserts that during a meeting with Major D'Angelico and union officials, she reiterated her "need for a reasonable accommodation, that is assignment to a regular post which would not require excessive stair climbing and inmate contact."   Dkt. No. 38-1 at ¶ 20.   Defendants assert that the purpose of this meeting was to discuss Plaintiff's "conflicting doctor's notes about her full duty status and to discuss what benefits were available to her when the time came to have

seeking was any light duty assignment for "as long as [she] had [her] injury."  Dkt. No. 36-21 at 48:4-10, 50:10-12.[29]

Plaintiff admits to not being able to complete her assignments in the A and B Buildings or the Annex of the Correctional Facility, all of which had stairs, without significant pain and swelling in her knees.  Dkt. No 36-1 at ¶ 32.[30]  At the time Plaintiff filed her Complaint in May 2021, she was unable to climb stairs or run.  Dkt. No. 36-1 at ¶ 33.

On July 7, 2021, Plaintiff left work early and attempted to provide a light duty note.  Dkt. No. 36-1 at ¶ 141.  Plaintiff was notified that day that she could not return to work until she received a physician's note stating that she could work full duty.  *Id*.  On July 9, 2021, Plaintiff began taking FMLA leave.  Dkt. No. 36-2 at ¶ 7; Dkt. No. 38-1 at ¶ 10.[31]

### G.   Plaintiff's Surgeries

Defendants allege that Plaintiff led them to believe over the course of 2020 and 2021 that she needed surgery and was waiting for the resolution of her Workers' Compensation case.  Dkt.

---

her knee procedures done."  *Compare* Dkt. No. 36-1 at ¶ 133 *with* Dkt. No. 39-1 at ¶ 133.

[29] It appears that once Defendants withdrew Plaintiff's light duty assignment, Plaintiff requested a position in a linear tier, without stairs, even if it involved some inmate contact.  *See* Dkt. No. 38-1 at ¶ 15 (Plaintiff states that she requested a "linear bid" in October 2020 when Defendants removed her from light duty assignment); Dkt. No. 35-6 at 56:6-12 (Plaintiff testified that she requested that her superiors "change the job to one without stairs"); Dkt. No. 34-26 (Plaintiff reiterating her request to Major D'Angelico for assignments which "do not require [her] to climb stairs extensively").

[30] Plaintiff alleges that in 2021 she was assigned to Building A and Building B posts for eight to sixteen hour shifts between 50 to 60 percent of the time, even though Plaintiff did not bid for Buildings A or B or receive "them through the seniority-based bidding process" and there were "at least thirty [] possible [Correction Officer] assignments" for which Plaintiff "was fully able to perform the essential duties."  Dkt. No. 1 at ¶¶ 32-34.

[31] Plaintiff took FMLA leave as of July 9, 2021 and used her remaining accruals.  Dkt. No. 36-2 at ¶ 7.  Plaintiff then took advanced sick time benefits afforded under the CBA from August 31, 2021 to September 20, 2021, took sick leave at half pay under the CBA from September 24, 2021 to June 9, 2022, and remained on unpaid leave from June 10, 2022 to November 20, 2022.  Dkt. No. 36-2 at ¶¶ 8-10.

No. 36-1 at ¶¶ 35, 138-139.  In the event Workers' Compensation disallowed her claim, Defendants understood that Plaintiff would travel to Hungary to have knee surgery.  Dkt. No. 36-1 at ¶¶ 35, 136.[32]  Plaintiff traveled to Hungary in May 2021, but did not have surgery there.  *Id.* at ¶ 137.

On August 3, 2021, Dr. Lozman opined that there was "no surgical intervention" which would allow Plaintiff to return to her previous level of work and recommended that Plaintiff consider "permanent disability."  Dkt. No. 36-24 at 16.  Plaintiff emailed Major D'Angelico that Dr. Lozman did not feel that surgery "was a good option" at that time and she would be requesting a second opinion and reiterated her request for "assignments which do not require [her] to climb stairs extensively."  Dkt. No. 36-26 at 2.

On September 2, 2021, Plaintiff saw Dr. Frederick J. Fletcher, an orthopedic surgeon, who diagnosed her with arthritic knees.  Dkt. No. 36-1 at ¶ 37.  On October 13, 2021, Dr. Fletcher noted that Plaintiff "had trouble walking down stairs and even walking on flat ground after a short period of time bothered her."  Dkt. No. 36-1 at ¶ 38; Dkt. No. 36-27 at 6.

On October 26, 2021, Plaintiff had double knee replacement surgery.  Dkt. No. 36-1 at ¶ 39.  Plaintiff continued to experience knee issues and underwent a second surgery on January 25, 2022, a bilateral knee manipulation to break up scar tissue within her knees.  *Id*. at ¶ 40.

### H.  Plaintiff's Return to Full Duty

Following her surgeries, Plaintiff presented a note from Dr. Fletcher in Spring 2022 that she could return to work on light duty; however, Major D'Angelico advised her that she could not

---

[32] Plaintiff disputes these assertions and alleges that she discussed her concerns with Major D'Angelico about the "lengthy recuperation period" from surgery.  Dkt. No. 38-1 at ¶ 7; Dkt. No. 39-1 at ¶ 35.  Plaintiff further alleges that she was undergoing physical therapy and attempting to recover the full use of her knee without surgery, went to Hungary to explore her options, and did not represent that she was traveling to Hungary to have surgery but did state that if she needed surgery, she would have it in Hungary because she has relatives there and health care is free.  Dkt. No. 38 at ¶ 7.

return to work until she was cleared to return for full duty.  Dkt. No. 36-1 at ¶ 143; Dkt. No. 38-1 at ¶ 8.  By July 2022, Dr. Fletcher opined that Plaintiff may "return to work full duty on July 28, 2022."  Dkt. No. 36-1 at ¶ 41; Dkt. No. 36-27 at 35.[33]  Plaintiff returned to work on or about December 1, 2022,[34] after presenting a full duty no restrictions note.[35]  Dkt. No. 36-1 at ¶¶ 43-44.

## III.    STANDARD OF REVIEW

Summary judgment is properly granted only if, upon reviewing the evidence in the light most favorable to the nonmovant, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Richardson v. Selsky*, 5 F.3d 616, 621 (2d Cir. 1993).  A court first determines "whether the evidence presents a sufficient disagreement to require submission to a [factfinder] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986).  "When analyzing a summary judgment motion, the court 'cannot try issues of fact; it can only determine whether there are issues to be tried.'"  *Galeotti v. Cianbro Corp.*, No. 5:12-cv-00900 (MAD/TWD), 2013 WL 3207312, at *4 (N.D.N.Y. June 24, 2013) (quoting *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36-37 (2d Cir. 1994)).

---

[33] Defendants allege that Plaintiff did not provide a note to the Correctional Facility.  Dkt. No. 36-1 at ¶ 42.  Plaintiff alleges that she provided the note to Major D'Angelico "in a timely manner . . . but thereafter did not feel capable of handling" climbing stairs and feared she might fall and "reverse the gains of her surgery" so she instead requested light duty.  Dkt. No. 39-1 at ¶ 42 (citing Dkt. No. 38-1 at ¶ 8).

[34] The parties dispute whether Plaintiff returned to work on November 23, 2022 or December 1, 2022.  *Compare* Dkt. No. 36-1 at ¶ 43, *with* Dkt. No. 39-1 at ¶ 43.

[35] Dr. Fletcher's note stated that Plaintiff could work light duty "as of" November 17, 2022, and could return with "no restrictions" on November 23, 2022.  Dkt. No. 36-30 at 2.

Defendants, in seeking summary judgment, "bear[] the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [their] right to judgment as a matter of law." *Rodriguez v. City of New York*, 72 F.3d 1051, 1060-61 (2d Cir. 1995) (citation omitted). To determine whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *accord Gibbs-Alfano v. Burton*, 281 F.3d 12, 18 (2d Cir. 2002). A "material" fact is one that would "affect the outcome of the suit under the governing law," and a dispute about a genuine issue of material fact occurs if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 57 (2d Cir. 1997). A court should "grant summary judgment where the nonmovant's evidence is merely colorable, conclusory, speculative or not significantly probative." *Schwimmer v. Kaladjian*, 988 F. Supp. 631, 638 (S.D.N.Y. 1997) (citing, *inter alia*, *Anderson*, 477 U.S. at 249-50).

## IV.    DISCUSSION

The ADA prohibits an employer from discriminating against an employee on the basis of a disability. 42 U.S.C. § 12112(a). Discrimination in violation of the ADA includes, *inter alia*, "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless [the employer] can demonstrate that the accommodation would impose an undue hardship on" its operations. 42 U.S.C. § 12112(b)(5)(A).

Plaintiff alleges that Defendants failed to provide a reasonable accommodation pursuant to the ADA. *See generally* Dkt. No. 1. Defendants argue that they are entitled to summary judgment on Plaintiff's ADA claim for two reasons. First, Defendants argue that Plaintiff is unable to establish a *prima facia* case of ADA discrimination because she was unqualified to perform the

essential functions of being a Correction Officer during the period she requested a reasonable accommodation, and, therefore, Defendants were not required to provide Plaintiff with her requested accommodation, a long-term light duty assignment. Dkt. No. 36-4 at 7-18. Second, Defendants argue that providing Plaintiff with a long-term light duty assignment as an accommodation would cause an undue hardship on the Correctional Facility. *Id.* at 18-23.

### A.   Plaintiff's *Prima Facie* Case of Discrimination

To establish a *prima facie* case of discrimination under the ADA, a plaintiff must establish that: "(1) the defendant is subject to the ADA; (2) the plaintiff was disabled within the meaning of the ADA; (3) the plaintiff was otherwise qualified to perform the essential functions of [her] job, with or without a reasonable accommodation; and (4) the plaintiff suffered an adverse employment action because of [her] disability." *Muller v. NAES Corp.*, No. 1:20-CV-00002 (BKS) (TWD), 2023 WL 2165343, at *7 (N.D.N.Y. Feb. 22, 2023) (citing *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 134 (2d Cir. 2008)).[36] To "establish a *prima facie* case for failure to provide a reasonable accommodation, a plaintiff also must satisfy the first three factors, but for the fourth factor, [she] must show by a preponderance of the evidence that [her] employer refused to make a reasonable accommodation." *Woolf v. Strada*, 949 F.3d 89, 93 (2d Cir. 2020).

### 1.   Otherwise Qualified to Perform the Essential Functions of a Correction Officer

A "plaintiff claiming that an employer failed to offer a reasonable accommodation bears the burden of establishing that an accommodation exists that permits her to perform the job's essential functions." *E.E.O.C. v. Yellow Freight Sys., Inc.*, No. 98 CIV. 2270 (THK), 2002 WL 31011859, at *18 (S.D.N.Y. Sept. 9, 2002) (internal quotation marks and citation omitted). Here, Plaintiff

---

[36] Defendants do not dispute that they are subject to the ADA and that, "at the summary judgment phase," Plaintiff "could be considered disabled" within the meaning of the ADA. Dkt. No. 36-4 at 9.

argues that there are numerous light duty posts available at the Correctional Facility that allow her to perform the essential functions of a Correction Officer.  Dkt. No. 38 at 11-12.

### a.   Essential Functions of a Correction Officer

In evaluating whether, in light of her disability, Plaintiff was otherwise qualified to be a Correction Officer, the court first needs to identify the essential functions of the position.  *See Palmieri v. City of Hartford*, 947 F. Supp. 2d 187, 201 (D. Conn. 2013).  Although "the term 'essential functions' is not defined in the ADA, the regulations promulgated by the EEOC[37] define this term as the 'fundamental' duties to be performed in the position in question, but not functions that are merely 'marginal.'" *Jackson v. City of New York*, No. CV 06-1835 (RRM) (MDG), 2011 WL 1533471, at *12 (E.D.N.Y. Mar. 3, 2011) (quoting 29 C.F.R. § 1630.2(n)(1)), *report and recommendation adopted sub nom.*, 2011 WL 1527935 (E.D.N.Y. Apr. 22, 2011).  The "identification of the essential functions of a job requires a fact-specific inquiry into both the employer's description of a job and how the job is actually performed in practice." *Carey v. Cnty. of Albany*, No. 1:14-CV-420 (GLS) (CFH), 2016 WL 4098598, at *4 (N.D.N.Y. July 28, 2016) (internal quotation marks and citation omitted).

Defendants argue that the Court must give "considerable deference to an employer's judgment regarding what functions are essential," *see D'Amico v. City of New York*, 132 F.3d 145, 151 (2d Cir. 1998), and the CBA, post orders, and civil service job description define the "essential functions" of a Correction Officer to include the "custody, care and control of inmates," to be

---

[37] The EEOC regulations state that "evidence of whether a particular function is essential includes, but is not limited to: (i) The employer's judgment as to which functions are essential; (ii) Written job descriptions prepared before advertising or interviewing applicants for the job; (iii) The amount of time spent on the job performing the function; (iv) The consequences of not requiring the incumbent to perform the function; (v) The terms of a collective bargaining agreement; (vi) The work experience of past incumbents in the job; and/or (vii) The current work experience of incumbents in similar jobs."  29 C.F.R. § 1630.2(n).

physically fit, to respond to emergencies, to make supervisory rounds, to work in all areas of the Correctional Facility, and to work mandatory overtime.  Dkt. No. 36-4 at 10-11 (citing Dkt. Nos. 36-9, 36-16); Dkt. No. 41 at 4-5.  Additionally, Defendants argue that "[t]he fact that certain [light duty] posts do not deal directly with inmates does not mean that working with inmates is not an essential function of being a" Correction Officer.  Dkt. No. 41 at 5.

In response, Plaintiff argues that there are "a number of posts within the Albany County Jail" that "have long been used for persons who need accommodations" which are "essential to the operation of the facility," and therefore the "essential functions" should be evaluated based on the light duty assignments Plaintiff requested and did work.  Dkt. No. 38 at 11-12.

Courts have found that the inquiry into whether a plaintiff can perform the essential functions of a job is fact-specific and an employer's judgment as to the essential functions, while entitled to substantial deference, is not dispositive.  *See, e.g., Campa v. Entergy Nuclear Operations, Inc*., No. 17-CV-792 (KMK), 2019 WL 4221560, at *11 (S.D.N.Y. Sept. 5, 2019) (noting that a defendant's judgment of the essential duties is "not dispositive"); *Welch v. United Parcel Serv*., Inc., 871 F. Supp. 2d 164, 187 (E.D.N.Y. 2012) (determining that "whether physical qualifications are essential functions of a job requires the court to engage in a *highly fact-specific inquiry*" and "[s]uch a determination should be based upon more than statements in a job description and should reflect the actual functioning and circumstances of the particular enterprise involved") (citation omitted and emphasis in original).

A job function is considered "essential" when there is evidence that all employees in a particular position must be able to perform that function.  *See, e.g.*, *Flieger v. E. Suffolk BOCES*, 693 Fed. App'x 14, 20 (2d Cir. 2017) (finding that plaintiff's disability prevented her from performing essential functions of a Teaching Assistant, including physically holding or escorting

17

students in danger of causing injury to themselves and others) (summary order); *Davis v. NYC Health and Hospitals Corp.*, 508 Fed. App'x 26, 29 (2d Cir. 2013) (finding that "direct patient care" is an essential function of a head nurse at the hospital and plaintiff's physical limitations precluded her ability to respond to medical emergencies, among other essential functions of her job) (summary order); *Shepheard v. City of New York*, 577 F. Supp. 2d 669, 677 (S.D.N.Y. 2008) (finding that a Correction Captain was not qualified to perform the essential functions of her position due to the physical manifestations of her depression which prevented her from being able to quickly respond to emergencies involving inmates), *aff'd by* 360 Fed. App'x 249 (2d Cir. 2010).

However, courts have found that a question of fact exists as to whether a particular job function is "essential" where a plaintiff has presented evidence that not all employees in a particular position must perform that function. *See, e.g.*, *Jackson*, 2011 WL 1533471, at *13-15 (finding a question of fact as to whether "patrol duties are an essential function of being a police officer" where plaintiff presented evidence that the New York Police Department ("NYPD") had a policy of assigning police officers to light duty assignments, where they never "went on patrol" for extended periods of time and sometimes permanently); *Henchey v. Town of North Greenbush*, 831 F. Supp. 960, 966-67 (N.D.N.Y. 1993) (finding that a question of fact existed as to whether heavy lifting is an "essential function of the laborer position" within the town's Highway Department despite a written job description stating that the worker must have the "ability to lift heavy weights," because some employees were not required to do any heavy lifting); *Schroeder v. Suffolk Cnty. Cmty. Coll.,* No. 07-CV-2060 (JFB) (WDW), 2009 WL 1748869, at *13 (E.D.N.Y. June 22, 2009) (denying summary judgment where it was disputed "as to what kind of walking, or any [other] physical demands . . .  bearing on [plaintiff's] foot's condition . . .  [was] essential for the job"); *Russell v. City of New York*, No. CV 05–0948, 2006 WL 2333728, at *3 (E.D.N.Y. Aug.

9, 2006) (finding that whether carrying a firearm is an essential function of being a police officer "is a factual issue" when plaintiff put forth evidence that the NYPD "accommodated other individuals who [were] disabled by transferring them to non-patrol positions" that did not require them to patrol or carry a firearm); *Stewart v. Cnty. of Salem*, 274 F. Supp. 3d 254, 262 (D.N.J. 2017) (finding a question of fact as to whether "'frequent' stair climbing is an essential function" of a Correction Officer when plaintiff presented evidence that not all Correction Officers must frequently climb stairs).

In *Stone v. City of Mount Vernon*, 118 F.3d 92 (2d Cir. 1997), a disabled firefighter requested an accommodation, asking to be assigned to one of two light duty bureaus. *Id.* at 94. The Second Circuit found that essential functions of a firefighter should be analyzed based on those functions required for a firefighter assigned to a light duty bureau rather than an active firefighting bureau. *Id.* at 99. The Court explained:

> We in no way suggest that the essential duties of a firefighter do not normally include fighting fires. However, proper analysis of a claim under the federal disability statutes must be focused on 'the fundamental job duties *of the employment position the individual with a disability . . . desires*,' 29 C.F.R. § 1630.2(n)(1), rather than solely on the title held by a person occupying that position or the other positions occupied by most persons holding that title.

*Id.* (emphasis in original).

As to the essential duties of a Correction Officer, courts have found that a question of fact exists as to whether supervision of inmates is an essential function of being a Correction Officer when a plaintiff presented facts sufficient to demonstrate that there were job assignments available which did not require contact with inmates. For example, in *Sharp v. Abate*, 887 F. Supp. 695 (S.D.N.Y. 1995), the court explained:

> It is undisputed that the duties of [C]orrection [O]fficers . . . include activities requiring contact with prisoners. In fact, the Department's written job description for the position of [C]orrection [O]fficer states that an officer 'maintains security

19

within correctional facilities and is responsible for the custody, control, care, job training and work performance of inmates' . . . . It is clear from the evidence in the record that the Department considers the custody, control and care of inmates an essential function of the job.  It is equally clear, however, that the actual duties of many [C]orrection [O]fficers involve no inmate contact.  Non-contact positions exist in many areas of the Department's prisons—for example, in the central control room, in personnel, at the custody desk, entrance security, general office and cashier, among many others . . . . Furthermore, positions involving no contact with inmates exist also within the several administrative divisions of the Department . . . . At first blush, there is great appeal to the proposition that guarding prisoners is an essential function . . . . But neither the facts of this case nor the law are quite so simple . . . [T]he Court is constrained to hold that the question whether the supervision of inmates is an essential function of a correction officer raises a genuine issue of fact.

*Id.* at 696-99 (internal citations and quotation marks omitted); *accord Monroe v. County of Orange*, No. 14-CV-1957, 2016 WL 5394745, at *13 (S.D.N.Y. Sept. 27, 2016) (finding a question of fact as to whether the "essential functions" of a Correction Officer included "substantial inmate contact" when plaintiff presented evidence of various light duty positions with limited inmate contact); *Yeager v. Corr. Corp. of Am.*, 944 F. Supp. 2d 913, 923-24 (E.D. Cal. 2013) (denying summary judgment because there was insufficient evidence that inmate contact was a "fundamental duty of" Correction Officers assigned to a light duty post).

Plaintiff admits that she could not perform several of the functions set forth in the CBA and post orders associated with inmate contact, including climbing stairs, sitting in a low chair, squatting, twisting, or running when she requested accommodation.  Dkt. No. 36-1 at ¶¶ 29, 32-33, 110, 123, 143.  However, Plaintiff asserts that she repeatedly requested accommodations which did not require "excessive stair climbing and inmate contact," and there were "nearly 40 posts" which could accommodate her.  *See* Dkt. No. 38-1 at ¶¶ 6, 20.  Major D'Angelico also testified that there are several light duty posts which have no inmate contact, including the Building A control area, the Building B control area, lobby controls, main controls, the medical control area,

and three positions in booking.  Dkt. No. 36-1 at ¶¶ 100-02; Dkt. No. 36-7 at 19:16-23.[38]

Defendants acknowledge that they have a practice of providing light duty assignments to Correction Officers who are found eligible for Section 207-c and/or Workers' Compensation benefits, including Correction Officers with pending claims.  Dkt. No. 36-1 at ¶¶ 92-93. Additionally, as a matter of practice, Defendants have provided light duty assignments to Correction Officers with non-work-related injuries.  *See* Dkt. No. 36-8 at 27:6-28:15; Dkt. No. 38-7 at 3-4.

While the Court is mindful that it must give "considerable deference to an employer's judgment regarding what functions are essential for service in a particular position," *see Monroe*, 2016 WL 5394745, at *13 (citation omitted), the Court finds, drawing all reasonable inferences in Plaintiff's favor, that Plaintiff has raised a triable question of fact as to whether the "custody, care and control" of inmates among other duties defined in the CBA, post orders, and civil service job description are essential functions of a Correction Officer at the Correctional Facility.

### b.   Otherwise Qualified to Perform a Light Duty Assignment

"After the essential functions of the position are determined, the plaintiff must demonstrate that he or she could have performed these functions, with or without reasonable accommodation, at the time of the" adverse action.  *Palmieri*, 947 F. Supp. 2d at 203 (quoting *McMillan v. City of New York,* 711 F.3d 120, 127 (2d Cir. 2013)).  Defendants argue that Plaintiff's arthritic knee condition prevented her from performing "the essential functions of [a Correction Officer] with or without a reasonable accommodation."  Dkt. No. 36-4 at 9.[39]  Plaintiff argues, in response, that she

---

[38]  Defendants also admitted that there are "linear tiers" of housing, without stairs, which Plaintiff requested to be assigned when she was removed from light duty in October 2020.  Dkt. No. 36-1 at ¶ 89; Dkt. No. 38-1 at ¶ 15.

[39] Defendants point to Plaintiff's admission that she could not run, climb stairs, and sit in or get up from a low chair, the fact that Plaintiff left shifts early at times during the period October 2020 to

was qualified to perform, and did satisfactorily perform, the "essential functions" of light duty posts.  Dkt. No. 38-1 at 11-12.

The ADA defines a "reasonable accommodation" as a "modification 'to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable[s] an individual with a disability who is qualified to perform the essential functions of that position.'" *Atencio v. United States Postal Serv.*, 198 F. Supp. 3d 340, 356 (S.D.N.Y. 2016) (quoting 29 C.F.R. § 1630.2(o)(1)(ii)).  A reasonable accommodation may include "job restructuring, part-time modified schedules, [or] reassignment to a vacant position[.]"  42 U.S.C. § 12111(9)(B).  In terms of demonstrating that an accommodation is reasonable, "plaintiff bears only a burden of production." *Farina v. Cnty. of Orange,* No. 15 CIV. 5207 (PED), 2018 WL 10704514, at *5 (S.D.N.Y. June 27, 2018) (quoting *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 138 (2d Cir. 1995)).  The "burden is not a heavy one . . . . 'It is enough for the plaintiff to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits.'"  *Id.* (citations omitted).  However, a "reasonable accommodation can never involve the elimination of an essential function of a job." *Shannon v. N.Y.C. Trans. Auth.*, 332 F.3d 95, 100 (2d Cir. 2003) (citation omitted).

Plaintiff admitted that her physical abilities were limited during the time she requested accommodation, including getting up and down from a low chair and climbing stairs.  Dkt. No. 39-1 at ¶¶ 18, 32-33, 38.  Additionally, when Plaintiff was denied an accommodation and put on full duty from October 2020 to July 2021, Plaintiff would leave shifts early due to pain in her

---

July 2021 due to knee pain, Dr. Lozman's, Gingras's and Fletcher's evaluations that Plaintiff's arthritic knee condition would cause her difficulty with the physical demands of the job, and Dr. Gingras's alleged finding that Plaintiff may never be able to return as a full duty Correction Officer.  Dkt. No. 36-4 at 12-14.

knees.  Dkt. No. 36-1 at ¶ 27; Dkt. No. 38-1 at ¶ 4.  As of October 13, 2021, Dr. Fletcher noted that Plaintiff had trouble walking on flat ground for more than a short period of time.  Dkt. No. 36-1 at ¶ 38.

On the other hand, Plaintiff was assigned to, and performed in, light duty posts from October 2019 to October 2020.  Major D'Angelico testified that he did not hear of any complaints about Plaintiff's performance in these light duty posts from tour commanders or other officers. Dkt. No. 36-7 at 71:9-72:8. Moreover, Plaintiff did not take any FMLA leave, unpaid medical leave, or sick leave at half pay in 2020 when she was assigned to light duty posts.  Dkt. No. 36-1 at ¶ 58; Dkt. No. 38-1 at ¶ 12.  Additionally, once Plaintiff returned to full duty work in October 2020, she performed her full duty job, although she suffered from significant pain and swelling in her knees while doing so.  Dkt. No. 36-1 at ¶¶ 32, 70.

Accordingly, the Court finds that Plaintiff has raised a material question of fact as to whether she was able to perform the essential functions of a Correction Officer with or without a reasonable accommodation.

### 2.   Obligation to Provide Long-Term Light Duty Work

Defendants also argue that Plaintiff is unable to establish a *prima facia* case of discrimination under the ADA as "Albany County was not legally required to provide her a permanent light duty accommodation which is the reasonable accommodation she demanded for over two years," because granting that request would require Defendants to create a new position, which it is not required to do under the ADA. Dkt. No. 36-4 at 9.[40]  Therefore, Defendants contend

---

[40] Defendants argue that Plaintiff did not have a work-related injury and was not entitled to the same benefits as those granted under Section 207-c and Workers' Compensation.  Dkt. No. 36-4 at 17; Dkt. No. 41 at 7-8.  Rather, the CBA only gives employees "up to a year to resolve any non-job-related illness or injury, which renders the employee unable to perform the duties of their employment."  Dkt. No. 36-4 at 17; Dkt. No. 41 at 7.

that Plaintiff did not suffer any adverse employment action[41] "other than the Sheriff's Department refusing to continue to allow Plaintiff to work light duty." *Id.* at 17.[42]

Plaintiff argues that a "reasonable accommodation" under the ADA requires "modification of job duties and schedules" and, under certain circumstances "'reassignment to a vacant position,'" *see McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 97 (2d Cir. 2009) (quoting 42 U.S.C. § 12111(9)(B)), which Defendants failed to do between October 2020 and November 2022 when they did not allow her to work on light duty assignment, Dkt. No. 38 at 3, 11. Plaintiff contends that Defendants do not have a written policy or practice of assigning light duty for non-work-related injuries only on a temporary basis, some Correction Officers are assigned to these posts on a long-term basis, and Defendants have not produced evidence to show that Plaintiff could not be accommodated with a vacant light-duty position on a long-term basis. Dkt. No. 38 at 12-13; Dkt. No. 38-7 at 3-4.

"Reassignment of a disabled employee to a vacant light-duty position is well established as a reasonable accommodation under the ADA." *King v. Town of Wallkill*, 302 F. Supp. 2d 279, 291 (S.D.N.Y. 2004) (citation omitted). However, "the ADA does not require creating a new [light duty] position for a disabled employee," *Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 187 (2d Cir. 2006), or require an employer "make permanent previously temporary light-duty positions,"

---

[41] Under the ADA, "[t]o qualify as an adverse employment action, the employer's action toward the plaintiff must be materially adverse with respect to the terms and conditions of employment." *Monroe*, 2016 WL 5394745, at *17 (citation omitted). "Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Id.* at *17 (citations omitted).

[42] Defendants also assert that Plaintiff was not prevented "from taking advantage of the other benefits afforded under the CBA" given that on July 9, 2021, after Plaintiff was told she could only return to work when she was cleared to work full duty, Plaintiff took "FMLA leave and used whatever few accruals she had left and took advantage of the advanced sick time and sick leave at half pay benefits afforded under the CBA." Dkt. No. 36-4 at 17.

*Wolfinger v. Consol. Edison Co. of N.Y., Inc.*, No. 17-CV-1710, 2018 WL 3637964, at *11 (E.D.N.Y. July 31, 2018) (citation omitted); *see also Farina*, 2018 WL 10704514, at *7 (finding that the ADA did not require an employer to provide a permanent light duty assignment when there was a "clear policy" that light duty was temporary); *Carey*, 2016 WL 4098598, at *5 (finding that plaintiff did not provide evidence that an accommodation was possible where it was "undisputed that a vacant permanent, light duty position did not exist when [plaintiff] made his request."); *King*, 302 F. Supp. 2d at 291 ("We conclude that plaintiff's request for a permanent light-duty assignment fails as a matter of law because the record clearly demonstrates that these [light duty] positions do not exist in the Town's police department.").

Courts have found that a material question of fact exists as to whether a defendant provided a reasonable accommodation where an employee produces evidence that there were long-term light duty positions available. *See, e.g.*, *Stone*, 118 F.3d at 100 (finding that defendant did not demonstrate that a permanent light duty assignment was "unreasonable as a matter of law" when two employees had ten to twenty year assignments to a light duty unit); *Russell*, 2006 WL 2333728, at *3 (denying defendants' motion for judgment on the pleadings because plaintiff "alleged that the NYPD [] accommodated other individuals who are disabled by transferring them to non-patrol positions"); *Howell v. Michelin Tire Corp.*, 860 F. Supp. 1488, 1492-93 (M.D. Ala. 1994) (finding that an employer's accommodation of other employees by reassigning them to light duty tasks for longer periods than plaintiff creates a genuine dispute as to whether the employer reasonably accommodated plaintiff).

Here, the parties dispute whether Plaintiff was requesting a temporary or permanent light duty assignment. *Compare* Dkt. No. 36-1 at ¶¶ 29, 140 *with* Dkt. No. 39-1 at ¶¶ 29, 140. Plaintiff testified that she requested "light duty" for as long as she had "her injury." Dkt. No. 36-21 at 48:7-

11. The parties also dispute whether Plaintiff was attempting to make progress towards working full duty and whether she was preparing to have a knee procedure so she could return to long-term full duty work. *Compare* Dkt. No. 36-1 at ¶¶ 35, 111, 138 *with* Dkt. No. 39-1 at ¶¶ 35, 111, 138.

There is conflicting medical evidence as to whether Plaintiff's disability was temporary or long-term. Dr. Lozman issued several conflicting notes as to whether Plaintiff's restrictions due to her disability were temporary or long-term, and whether surgery would allow her to return to full duty. *See generally* Dkt. No. 36-24. Additionally, Dr. Gingras issued conflicting opinions concerning the nature of Plaintiff's injury, *see* Dkt. No. 36-25 at 5, and the parties dispute whether he believed Plaintiff would ever be able to return to full duty work, *compare* Dkt. No. 36-1 at ¶ 23, *with* Dkt. No. 39-1 at ¶ 23. Finally, after Plaintiff's surgery, Dr. Fletcher opined that Plaintiff would be able to return to work with no restrictions as of July 28, 2022, *see* Dkt. No. 36-1 at ¶ 41, but he also later wrote a note that Plaintiff would need to work light duty from November 17, 2022 until November 23, 2022, *see* Dkt. No. 36-30 at 2.

The Court finds that these disputes create a material issue of fact as to whether Plaintiff was requesting a temporary or permanent light duty position. Additionally, there is a question of fact as to whether Defendants have a policy or practice of only providing temporary light duty work for non-work-related injuries. While the Correctional Facility has a policy or practice of providing a light duty assignment to Correction Officers who are found eligible to receive Section 207-c and/or Workers' Compensation benefits, the policy or practice as to light duty assignment for non-work-related injuries is disputed. Dkt. No. 36-1 at ¶¶ 92-93, 95, 106-07. Superintendent Lyons testified that as a matter of practice for at least the past ten years, the Correctional Facility has "allowed people who had non-work-related injuries to come back to work light duty." Dkt. No. 36-8 at 27:6-28:15. Additionally, Plaintiff testified that a Correction Officer was assigned to

a light duty post for four years, Dkt. No. 36-21 at 57:18-58:12, and Plaintiff produced as an exhibit a list of fifteen Correction Officers who were provided with light duty who had both work-related and non-work-related injuries, Dkt. No. 38-7 at 3-4.

In sum, viewing the evidence in the light most favorable to Plaintiff, the Court finds that Plaintiff has raised a material question of fact as to whether she suffered an adverse employment action when Defendants denied her requests to continue working in a light duty assignment beyond a year.[43]   Accordingly, the Court finds that Plaintiff has raised a triable issue of fact as to whether Defendants failed to provide Plaintiff with a reasonable accommodation in violation of the ADA.

### B.   Undue Hardship of a Long-Term Light Duty Assignment

If a plaintiff demonstrates that a reasonable accommodation exists, "[t]he burden of persuasion [] shifts to the defendant to rebut the reasonableness of the proposed accommodation . . . [and show] that the proposed accommodation would cause [the defendant] to suffer an undue hardship." *Wright v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 831 F.3d 64, 76 (2d Cir. 2016) (internal quotations and citation omitted).   The term "undue hardship" is defined as '"an action requiring significant difficulty or expense' considering, among other factors, the 'nature and cost of the accommodation' and the 'overall financial resources' of the employer." *Atencio*, 198

---

[43] The Court also notes, without deciding, that Plaintiff may have suffered an adverse employment action when Defendants refused to allow Plaintiff to return from medical leave until she was medically cleared to work full duty.   While a temporary or even an extended leave of absence can be a reasonable accommodation, *see Cayetano v. Fed. Express Corp.*, No. 19 CIV. 10619 (AT), 2022 WL 2467735, at *6 (S.D.N.Y. July 6, 2022) (citations omitted), an "employer cannot require an employee who can perform her job with reasonable accommodations to stay out of work until she is 100% healthy," *Jacobson v. Cap. One Fin. Corp.*, No. 16-CV-06169 (CM), 2018 WL 6817064, at *20 (S.D.N.Y. Dec. 12, 2018).   *See also Furman v. City of New York*, No. 07-CV-1014 (RRM) (JO), 2009 WL 4626706, at *6 (E.D.N.Y. Dec. 7, 2009) (noting that courts have consistently found that a "policy that requires an employee to be 100 percent healed prior to returning to work violates the ADA") (citations omitted); *Yellow Freight Sys., Inc.*, 2002 WL 31011859, at *20 ("Courts have consistently found that policies prohibiting injured employees from returning to work unless they can do so 'without restrictions' violate the ADA.").

F. Supp. 3d at 357 (quoting 42 U.S.C. § 12111(10)(A)-(B)).[44]

Defendants argue that requiring them to have provided a permanent light duty position for Plaintiff would have been an undue hardship because Plaintiff would have displaced Correction Officers who had bid for their placement or who needed to be accommodated pursuant to Section 207-c and/or Workers' Compensation.  Dkt. No. 41 at 9.  Defendants also argue that it would have been an undue burden to accommodate Plaintiff's request for a long-term light duty assignment because the Correctional Facility was understaffed.  *Id*.  Plaintiff argues in response that she is not seeking a permanent light duty position, and Defendants have not demonstrated that continuing to provide her with light duty work for "as long as she had her injury" would be an undue hardship. *See* Dkt. No. 36-21 at 48:7-11; Dkt. No. 38 at 13-14; Dkt. No. 39-1 at ¶¶ 29, 140.

Courts have found an undue hardship in the context of prison staff where defendants have demonstrated that a plaintiff's requested accommodation would cause significant difficulty or expense.  *See, e.g.*, *Farina*, 2018 WL 10704514, at *6-7 (finding that a Correction Officer's request to be assigned exclusively to two light duty units was an undue hardship because plaintiff was only qualified for one of the two positions, and could only be assigned to the post for which he was qualified sixty-three percent of the year at most); *Motta v. Meachum*, 969 F. Supp. 99, 116-17 (D. Conn. 1997) (finding that a Correction Officer's request for a light duty assignment would impose

---

[44] "In determining whether an accommodation would impose an undue hardship on a covered entity, factors to be considered include: (i) the nature and cost of the accommodation needed under this chapter; (ii) the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility; (iii) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and (iv) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative, or fiscal relationship of the facility or facilities in question to the covered entity." 42 U.S.C. § 12111(10)(B).

an undue hardship because it would not "adequately insulate plaintiff from exposure to inmates, who can unpredictably pose danger to plaintiff, her co-employees, and other inmates, even in the administrative offices of a prison").

On the other hand, courts have found a material question of fact where a defendant did not produce sufficient evidence that providing an accommodation would cause an undue financial or administrative burden. *See, e.g.*, *Granica v. Town of Hamburg*, 237 F. Supp. 3d 60, 80 (W.D.N.Y. 2017) (finding a question of fact as to whether plaintiff's request to be "assigned tasks that fell within the limits of his Functional Capacity Evaluations" was an undue hardship); *Henchey*, 831 F. Supp. at 968 (finding that plaintiff "offered evidence to suggest that the defendants' accommodation of [his] alleged disability did not cause any undue financial or administrative burdens on the Highway Department" and that "such accommodations were part of a longstanding Highway Department policy").

In *Stewart*, a Correction Officer who was unable to climb stairs for more than one-third of a 12-hour shift, requested to be assigned to units that did not require stairs.  274 F. Supp. 3d at 257.[45]  The plaintiff argued that many Correction Officers worked "at specific posts for long periods of time, and there were other [Correction Officers] who could work in the housing unit, which required climbing stairs," and that the County did not "articulat[e] any true 'undue hardship' over her request to be assigned to other various units, or her attempt to obtain other positions that did not require stair climbing."  *Id.* at 261.  As a result, the court found that a question of fact existed as to whether "accommodating [p]laintiff's disability of being unable to climb stairs for more than [one-third] of a 12-hour shift" was an undue hardship.  *Id.* at 263.

---

[45] The positions plaintiff listed included: Central Control, the kitchen, the disciplinary unit, the lobby, booking, the infirmary, and the female unit.  *Stewart*, 274 F. Supp. 3d at 261.

Here, the Court finds that Defendants have not produced sufficient evidence to show that providing Plaintiff with a light duty accommodation would cause an "undue hardship." The Court is mindful that a long-term light duty assignment may cause some financial and administrative inconvenience, especially during the pandemic when Plaintiff admitted that the Correctional Facility was short-staffed. *See* Dkt. No. 36-1 at ¶¶ 88, 90-91 (noting that the CBA provides that a Correction Officer must be able to work in all areas of the Correctional Facility due to operational needs and must be able to work mandatory overtime); Dkt. No. 36-4 at 21 (noting that a light duty accommodation is a bid position and providing a long-term light duty accommodation may displace "officers who earned those positions through the bid process").

However, courts have found that defendants' arguments that providing a Correction Officer with a light duty position would create administrative difficulty or other inconvenience failed to establish an undue burden under the ADA. *See e.g.*, *Skerski v. Time Warner Cable Co., a Div. of Time Warner Ent. Co., L.P.*, 257 F.3d 273, 285 (3d Cir. 2001) (finding defendant's argument that it would be inconvenient to make adjustments to accommodate a plaintiff's inability to climb stairs did not establish an "undue hardship" and noting that the ADA "compel[s] employers to look deeper and more creatively into the various possibilities suggested by an employee with a disability"); *see also Sharp*, 887 F. Supp. at 699 (noting, in reference to defendants' argument of a substantial financial burden to maintain an officer who was unable to supervise inmates, that "the fact that able-bodied [C]orrection [O]fficers are placed in clerical and administrative positions within the Department is troublesome").

Moreover, Plaintiff alleges that there were nearly forty posts which did not require excessive stair climbing and/or contact with inmates, *see* Dkt. No. 38-1 at ¶ 6; Dkt. No. 39-1 at ¶ 32, and Defendants identified approximately ten light duty posts with no inmate contact, each of

which had two shifts a day.  Dkt. No. 36-1 at ¶¶ 102, 105; Dkt. No. 36-7 at 19:16-23.  Additionally, Plaintiff presented a list of only fifteen Correction Officers who were receiving a light duty accommodation during 2020 through 2022, Dkt. No. 38 at 11; Dkt. No. 38-7 at 3-4, and alleges that to her knowledge, there was not a '"waiting line' of disabled officers waiting to occupy" a light duty post in October 2020 when she was denied any further light duty accommodation, Dkt. No. 38-1 at ¶ 22.

The Court finds that there is a material issue of fact as to whether providing Plaintiff with a light duty assignment between October 2020 and November 2022, when she was working full duty before her surgery and when she allegedly could perform light duty work after her surgery, would have imposed an undue hardship on Defendants.  Accordingly, Defendants' motion for summary judgment with respect to Plaintiff's claim for failure to provide her with a reasonable accommodation in violation of the ADA is denied.[46]

## V.      CONCLUSION

Accordingly, the Court hereby

---

[46] The Court notes, without deciding, that there also may be a question of fact as to whether Defendants failed to engage in an "interactive process" as contemplated by the ADA.  *See* 29 C.F.R. § 1630.2(o)(3) ("To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation.").  The "Second Circuit has noted that an interactive process includes 'meet[ing] with the employee who requests an accommodation, request[ing] information about the condition and what limitations the employee has, ask[ing] the employee what he or she specifically wants, show[ing] some sign of having considered [the] employee's request, and offer[ing] and discuss[ing] available alternatives when the request is too burdensome.'" *Cayetano*, 2022 WL 2467735, at *7 (quoting *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 219 (2d Cir. 2001)).  Plaintiff alleges that Defendants repeatedly denied her requests for an accommodation, intentionally assigned her to posts with excessive stair climbing fifty to sixty percent of the time when there were alternative assignments available, and that Major D'Angelico and Superintendent Lyons told her to "suck it up" and threatened to terminate her if she did not work full duty. Dkt. No. 1 at ¶¶ 26-32; *see generally* Dkt. No. 38-1.  Major D'Angelico also testified that he did not have training on the ADA.  *See* Dkt. No. 36-7 at 23:12-25.

**ORDERS** that Defendants' Motion for Summary Judgment, Dkt. No. 36, is **DENIED**; and the Court further

**ORDERS** that the Clerk serve a copy of this Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated:  September 22, 2023
      Albany, New York

Anne M. Nardacci
U.S. District Judge